United States District Court
Southern District of Texas
FILED

NOV 0 3 2000

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| WILLIAM K., Individually § <br> and as Next Friend of C.K., a minor child § <br> § <br> V. § <br> § <br> HARLINGEN CONSOLIDATED § <br> INDEPENDENT SCHOOL DISTRICT § <br> AND LUCIUS D. BUNTON, HEARING § <br> OFFICER FOR THE TEXAS § <br> EDUCATION AGENCY § | CASE NO. B-00-125 |

### PLAINTIFF'S SECOND SUPPLEMENTAL BRIEF
### IN SUPPORT OF PRELIMINARY INJUNCTION

TO THE UNITED STATES MAGISTRATE:

      NOW COMES, Plaintiff, William K., individually and as next friend of C.K., a minor child, who files this, his Second Supplemental Brief, and in support hereof, Plaintiff would show as follows:

1. On Friday, November 3, 2000, Plaintiff received yet another lengthy yet inapplicable brief submitted by the Harlingen Consolidated Independent School District ("HCISD") citing even more inapplicable authorities in their efforts to cloud the real issues of this case.

2. None of the authorities cited by HCISD are applicable because in all of the cases cited by HCISD, the Plaintiff was trying to prosecute his or her <u>entire</u> claim in federal court avoiding the administrative proceeding. In this case, the Plaintiff is merely trying to <u>preserve</u> a "fair" administrative hearing. The Plaintiff herein is trying to prevent the administrative hearing from being dismissed and has argued with great vigor that Plaintiff will be irreparably harmed if the administrative proceeding is dismissed. The Plaintiff has reluctantly conceded that he will submit his son to a very biased and prejudiced Dr. Oakland but Plaintiff merely requests in return, (pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, et. seq. (1997),

1

specifically section 1414 and 1415, and under the well recognized constitutional rights of a parent), that HCISD's "gun for hire," Dr. Oakland be videotaped doing his work. This will assure that his work his done with some level of honesty which can be, by visual and audio observation, verified.

3. The Plaintiff wants the administrative hearing to proceed and proceed quickly. The Plaintiff does not want his due process rights and rights as a parent violated by allowing HCISD to conduct secret and unexplained testing upon Plaintiff's son. Violation of constitutional rights should not be the price for a speedy administrative hearing. If this Court entered an immediate preliminary injunction, the testing by HCISD could proceed as early as next week, and the final hearing before the administrative officer could be concluded this month. Although the dismissal of the administrative proceeding would merely move the entire proceeding to this court, Plaintiff strongly desires to have the case heard in its entirety in the administrative proceeding first because Plaintiff believes that this is the fastest route to final conclusion.

4. Certainly, HCISD does not argue that under no circumstances can a federal court hear issues of constitutional importance prior to the final conclusion of an administrative proceeding. See e.g., **Holland v. District of Columbia**, 71 F.3d 417 (D.C. Cir. 1995), in which the federal court intervened to determine whether the testing proposed by the school district was fully explained to the parents before completing of the administrative proceeding. For example, under the absurd hypothetical, if the school district was proposing to take brain tissue samples of a child over the objection of the parents and with the support of an administrative law judge, there would be no argument that a federal Court would without dispute intervene and enjoin such action. In other words, there are circumstances in which a federal court can and should intervene during the course of an administrative proceeding and this is one of those circumstances.

5. If this Court does not intervene and enjoin HCISD and TEA and its hearing officer, Stephen Webb, HCISD's expert, (whose professional conduct so far is questionable), will have a secret

2

testing without any later professional scrutiny of his work. Unlike the Plaintiff's doctors, Dr. Oakland was hired merely to testify. He is a testifying expert who makes a living traveling the country testifying for a large professional fee, in favor of school districts. He has already given an opinion adverse to CK and his educational future without any testing or evaluation. Instead, Dr. Oakland's opinions were based upon an illegal and unethical viewing of Ck's confidential school records and medical records. Once Dr. Oakland has had his way with CK in seclusion and secrecy, there can be no doubt that Dr. Oakland will base his opinions upon those secret tests. Plaintiff and CK's educational future will be irreparably harmed. Dr. Oakland will be able to say just about anything and will be able to give opinions which may be absolute falsehoods because there will be no videotape evidence to refute Dr. Oakland and his already predictable testimony. Dr. Oakland's unsubstantiated testimony will be used both in the administrative proceeding and in any later federal court actions or appeals. The unjust damage to Plaintiff and his son will, in all likelihood, be substantial and incalculable. All traditional notions of due process and fundamental parental rights guaranteed by the Texas and federal constitutions would have been forever and irreparably violated.

6. Plaintiff further objects to affidavits and briefing materials received just today, being submitted so late in connection with this application for preliminary injunction. The application for preliminary injunction has been on file for several months, yet new authorities and post hearing affidavits containing hearsay, have just been put on file. During the hearing on November 1, 2000, Plaintiff brought to Court live Dr. Susan Ander who was ready to testify that videotaping of student evaluations is a routine and common practice. In fact, Dr. Ander set up the facility at Pan American University years ago, just for such activity. She has herself participated in many student testing procedures and re-evaluations, similar to those proposed in this case by HCISD for CK, in which the tests were video recorded or observed behind a one-way glass by graduate students, with no effect upon the test results. Plaintiff is ready to present such testimony live if necessary.

3

7. It is Plaintiff's belief that needed and essential educational services will be wrongfully denied CK if this Court does not immediately enjoin HCISD and TEA. Dismissal of the administrative proceeding will only cause further delay. CK's primary care psychiatrist, Dr. Joseph Biederman, is world renowned. He is currently ranked by the Institute for Scientific Information as the top child psychiatrist in the world. Dr. Biederman has had the honor of sitting on the Nobel Nominating Committee for Physiology and Medicine. Dr. Biederman is not a professional expert witness. CK was submitted to Dr. Biederman in 1999 at Harvard Medical School because of the severity of CK's condition. Dr. Biederman was highly recommended to the Plaintiff by several pediatric psychiatrists including one locally and one in Philadelphia. At the time that Dr. Biederman consulted, the Plaintiff never heard of a residential special education school and did not know that such facilities existed. Up until mid-April 2000, HCISD had Dr. Biederman's and Dr. Braaten's medical reports and test results. The ARD committee for HCISD, which included CK's then teachers and the school principal, continually praised Dr. Biederman's and Dr. Braaten's work and often commented how impressed they were with Dr. Biederman and Dr. Braaten. Only after Dr. Biederman recommended that CK be placed in a residential special education school did HCISD suddenly question their work and findings. Attached hereto as **Exhibit "A"** and incorporated herein by reference for all purposes is the April 14, 2000 letter from Dr. Biederman which caused the near paranoid response by HCISD and its attorneys. Over the Plaintiff's objections, HCISD had Dr. Oakland fly to Harlingen and observe in secrecy Plaintiff's son in his classroom, discuss CK with his teachers, and read CK's confidential school and medical records, all in violation of numerous state and federal statutes and in violation of the Texas and federal constitutions. This is the subject of a separate damage suit at issue in this litigation.

8. Plaintiff pleads with the Court not to allow HCISD an "open season" to run over the rights of the Plaintiff and CK by allowing a very tainted expert, Dr. Oakland, to secretly conduct unexplained

4

tests and evaluations without any outside professional scrutiny. At the hearing on November 1, 2000, the Court was very unimpressed with HCISD's answer to the Court's question: If you are agreeing to allow Mr. Kimball observe the testing from behind a one-way glass, why should he not be allowed to videotape the testing. Even the hearing officer, Stephen Webb, wrote in his October 6, 2000, Order:

> "I am not convinced, however, that the District is entitled to perform an evaluation outside of the presence of the parent in a manner that does not interfere with the evaluation. <u>I am even less impressed with the District's argument that the Petitioner is not even entitled to a discretely recorded videotape of the evaluation.</u>"

In a prior telephonic hearing in late August, 2000, Mr. Stephen Webb made several similar comments. Since October 6, 2000, Mr. Webb has apparently flip-flopped his opinion on this issue.

9. Further, of noteworthy importance, the 1997 Congressional amendments to IDEA are far reaching and monumental. Congress completely revised IDEA in 1997, from its "goals and purposes" in 20 U.S.C. §1400(d), to the "procedural rights" of parents in conducting evaluations and reevaluations of their children, as set forth in the new Sections 1414 and 1415 of IDEA. See e.g, **<u>Greater Expectations: How the 1997 IDEA Amendments Raise the Basic Floor of Opportunity for Children with Disabilities</u>**, 103 Dick. L.Rev. 613 (1999) and **<u>The Individuals with Disabilities Education Act Amendments of 1997</u>**, 122 Ed. Law Rep. 1103 (1998). The emphasis of the new IDEA Act has been expanded <u>from access to education, to meaningful educational outcomes</u> so that mentally handicapped students are prepared for employment and later social life. Congress overwhelmingly, and in a bipartisan manner, voted 98 to 1 in the Senate and 420 to 3 in the House of Representatives, to enact the revolutionary changes to IDEA including an increase in appropriations to fund special educational programs of $750.6 million, to $4 billion in 1997. See 103 Dick. L.Rev. 613, 637 (1999). The Congressional mandate is crystal clear. Now school districts **MUST**, as national policy, improve educational results and achievements for children with mental

disabilities to prepare these children for later educational challenges and employment. See 20 U.S.C. §1400 (c) and (d). Also see <u>President William Clinton's Remarks</u>, on signing the IDEA Amendments of 1997 available on Westlaw at 1997 WL 10084718. Also attached hereto as **Exhibit "B"**, please see the comments of Governor George W. Bush made on October 11, 2000, in a nationally televised Presidential Debate. He calls the practice of moving children through school without teaching the child to read as a "<u>New Civil Right</u>." As Mr. Bush describes himself, he is the Chief Executive Officer of the State of Texas. He is absolutely correct.

10. HCISD, as does many South Texas schools, has as its policy, a practice of passing children on in school to higher grades even though they cannot read. CK could not pass at this time a second grade exit exam, yet he is breezing through the Fifth Grade at HCISD because of its questionable practice of passing children on to the next grade regardless. Dr. Biederman and Dr. Braaten from Harvard Medical School strongly believe that CK's learning disabilities can be overcome at a residential special education facility. Plaintiff merely wants his son to be able to read at a meaningful level. Plaintiff brought his son to Court on November 1, 2000, for the Court could take CK back into chambers and see the terrible circumstances faced by CK and the emergency nature of this proceeding. Plaintiff would encourage the Court to meet and read with CK.

11. HCISD has refused all offers of mediation in this case both verbally and in writing by opposing Petitioner's Motion for Mediation in the administrative proceeding, all in violation of the letter and spirit of 20 U.S.C. §1414 and 1415 (1997). They simply will not negotiate and the only recourse is this Court.

12. Plaintiff maintains that the authorities cited by the Plaintiff in his Response to HCISD's Motion to Dismiss gives this Court ample authority to enjoin HCISD and TEA. For the reasons stated above, Plaintiff's administrative remedies on the video tape issue are <u>futile</u> or <u>inadequate</u>. See, e.g., **<u>Honig v. Doe</u>**, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988). **<u>Honig</u>** is straight

6

forward and applicable. It needs no further defining by lower courts.

13. Also, there is also an exception to the exhaustion requirement when irreparable injury is likely to result in the absence of immediate judicial review. **Lewis v. Reagan**, 660 F.2d 124, 127 (5th Cir. 1981) and **Sweet Life v. Dole**, 876 F.2d 402, 407 (5th Cir. 1989).

14. The facts in this case demonstrate that the administrative process would be futile, inadequate and that Plaintiff and CK would be irreparably harmed but for seeking relief in federal court. Plaintiff wants to preserve a **fair** administrative proceeding. That proceeding will be tainted but for the injunctive relief sought by the Plaintiff herein.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that HCISD's Motion to Dismiss should be denied in all respects. That Plaintiff's Motion for Preliminary Injunction be Granted in all respects prayed for by the Plaintiff. Plaintiff also prays for such other and further relief as the Court deems just in this matter.

Respectfully submitted,

**KOPPEL, EZELL, JACKSON & KIMBALL, L.L.P.**
Post Office Box 2878
312 E. Van Buren
Harlingen, Texas 78551
Tel. (956) 425-2000
Fax No. (956) 421-4258

BY: _/s/ William Kimball_
William Kimball
State Bar #11418700
Fed. I.D. No. 6159

7

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the above and foregoing instrument was on this 3rd day of November, 2000, faxed and mailed by certified mail, return receipt requested to: Ms. Bridget Robinson, **Walsh, Anderson, Brown, Schulze & Aldridge, P.C.**, P.O. Box 2156, Austin, Texas and Ms. Valerie R. Esparza, **Assistant Attorney General**, General Litigation Division, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548.

_____
William Kimball

8

 

15 Parkman Street, WACC #725
Mail Zone - WAC 725
Boston, Massachusetts 02114-3139

E-mail: biederman@helix.mgh.harvard.edu
Tel: 617.726.1731   Fax: 617.724.1540

Joseph Biederman, M.D.
*Chief, Joint Clinical and Research Program
in Pediatric Psychopharmacology
Massachusetts General Hospital*

*Professor of Psychiatry
Harvard Medical School*

April 14, 2000

**Re: Christopher Kimball**

To Whom It May Concern:

Christopher Kimball suffers from serious neuropsychiatric disorders including ADHD, learning disabilities, developmental deficits and mood disorder. I am strongly recommending that he be placed in a specialized school setting capable of dealing with his multiple emotional and developmental handicaps. I strongly believe that without such a placement his educational and emotional future will be in jeopardy.

Sincerely,

Joseph Biederman, M.D.
Chief,
Joint Program in Pediatric Psychopharmacology
Mass General and McLean Hospitals

Professor of Psychiatry
Harvard Medical School



EXHIBIT A

000001



PARTNERS  Health Care System Member

2

first and foremost our power ought to be wielded to in ways that form a more perfect union. The power of example is America's greatest power in the world. And that means, for example, standing up for human rights. It means addressing the problems of injustice and inequity, along the lines of race and ethnicity here at home, because in all these other places around the world where they're having these terrible problems, when they feel hope, it is often because they see in us a reflection of their potential. So we've got to enforce our civil rights laws. We've got to deal with things like racial profiling. And we have to keep our military strong. We have the strongest military, and I'll do whatever is necessary, if I'm president, to make sure that it stays that way. But our real power comes, I think, from our values.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MODERATOR: What -- if you become president, Governor, are there other areas, racial problem areas, that you would deal with as president involving discrimination? Like you said, Arab-Americans, but also Hispanics, Asians, as well as Blacks in this country.

BUSH: Let me tell you where the biggest discrimination comes. In public education when we just move children through the schools. My friend, Phyllis Hunter, is here. She had one of the greatest lines of all lines. She said, reading is the new civil right. She's right. And to make sure our society is as hopeful as it possibly can be, every single child in America must be educated. I mean every child. It starts with making sure every child learns to read. K-2 diagnostic testing so we know whether or not there's a deficiency. Curriculum that works and phonics needs to be an integral part of our reading curriculum. Intensive reading laboratories, teacher retraining. I mean, there needs to be a wholesale effort against racial profiling, which is illiterate children. We can do better in our public schools. We can close an achievement gap, and it starts with making sure we have strong accountability, Jim. One of the cornerstones of reform, and good reform, is to measure. Because when you measure you can ask the question, do they know? Is anybody being profiled? Is anybody being discriminated against? It becomes a tool, a corrective tool. And I believe the federal government must say that if you receive any money, any money from the federal government for disadvantaged children, for example, you must show us whether or not the children are learning. And if they are, fine. And if they're not, there has to be a consequence. And so to make sure we end up getting rid of basic structural prejudice is education. There is nothing more prejudiced than not educating a child.

MODERATOR: Vice President Gore, what would be on your racial discrimination elimination list as president?

GORE: Well, I think we need tough enforcement of the civil rights laws. I think we still need affirmative action. I would pass a hate crimes law, as I said, and I guess I had misunderstood the governor's previous position. The Byrd family may have a misunderstanding of it in Texas also. But I would like to shift, if I could, to the big issue of education.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



EXHIBIT B