19

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 03 2000

Michael N. Milby
Clerk of Court

WILLIAM K., Individually and as next friend of C.K., a minor child §
§
§
vs. § Civil Action No. B-00-125
§
HARLINGEN CONSOLIDATED INDEPENDENT SCHOOL DISTRICT and LUCIUS D. BUNTON, HEARING OFFICER FOR THE TEXAS EDUCATION AGENCY §

**DEFENDANT'S SUPPLEMENT IN SUPPORT OF ITS MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES** Defendant Harlingen Consolidated Independent School District (Harlingen CISD or HCISD), and files its Supplement in Support of its Motion to Dismiss and Response in Opposition to Plaintiffs' Application for a Preliminary Injunction.

**I.**

**THIS COURT LACKS JURISDICTION**

1. As argued in Defendant HCISD's Motion to Dismiss and at the hearing before this Court on November 1, 2000, this case should be dismissed pursuant to the dictate of FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction. The Court lacks jurisdiction because Plaintiff has failed to exhaust administrative remedies.

2. It is uncontroverted that there is currently pending a special education due process hearing before a Special Education Hearing Officer for the State of Texas which involves the subject matter of this suit. It is further uncontroverted that, through this proceeding, plaintiff seeks to have

this Court modify the terms of the Special Education Hearing Officer's order that the school district be allowed to evaluate the minor plaintiff C.K.

3. This Court does not have jurisdiction to consider or modify the non-appealable interlocutory orders of a Special Education Hearing Officer, whether those orders involved discovery disputes, the terms of a psychological or medical evaluation, the admission of evidence, or other matters. Rather, jurisdiction will lie with this Court only if the administrative proceedings are concluded and a decision is rendered by the Special Education Hearing Officer. *See* 20 U.S.C. §1415(i)(2)(A) [incorrectly cited as 20 U.S.C. § 1415(e)(2) in Defendant's Motion to Dismiss]. Pursuant to 20 U.S.C. § 1415(i)(2)(A), a party may only file a complaint if "aggrieved by the findings and decision" of the Special Education Hearing Officer. If this Court were to accept plaintiff's position that it has jurisdiction to review and modify every order issued by a Special Education Hearing Officer with which any party disagrees and is therefore "aggrieved," this Court will be placed in the untenable position of monitoring every decision by Special Education Hearing Officers in this state. Just as the Fifth Circuit lacks jurisdiction to modify the provisions of every order entered by this Court, so too this Court lacks jurisdiction to review and modify every order issued by a Special Education Hearing Officer. Only certain interlocutory orders, such as those granting a preliminary injunction, may be immediately appealed. *See* 28 U.S.C. § 1292(a)(1). There is no statutory exception that would allow the Special Education Hearing Officer's evaluation order to even be considered by this Court at this juncture.

4. As the Supreme Court has recognized, the "doctrine of exhaustion of administrative remedies is one among related doctrines — including abstention, finality, and ripeness— that govern the timing of federal-court decisionmaking. Of 'paramount importance' to any exhaustion inquiry

ClibPDF - www.fastio.com

is congressional intent. [citation omitted]. Where Congress specifically mandates, exhaustion is required. [citation omitted]." *McCarthy v. Madigan,* 503 U.S.140, 144, 112 S. Ct. 1081, 1086 (1992). In the case at bar, Congress clearly mandated that administrative remedies be exhausted and a final determination be made at the special education administrative hearing level prior to jurisdiction vesting in this case. *See* 20 U.S.C. § 1415(i)(2)(A). *See also Smith v. Robinson,* 468 U.S. 992, 1013, 104 S. Ct. 3457, 3469 (1984); *Andress v. Cleveland Indep. Sch. Dist.,* 64 F.3d 176, 178-79 (5th Cir. 1995); *Teague Independent School District v. Todd L.,* 999 F.2d 127, 130, n. 10 (5th Cir. 1993).

5. Just as there is no statutory basis for the appeal of an interlocutory order to this Court, neither does public policy permit the appeal of an interlocutory order in this case. Citing *Honig v. Doe,* 484 U.S. 305, 108 S. Ct. 592 (1988), plaintiff urges an exception to the requirement of exhaustion of administrative remedies based on the allegation that exhaustion would be futile. As even the *Honig* Court acknowledged, however, futility can only excuse the mandatory exhaustion requirement in an "appropriate case." *Honig,* 484 U.S. at 328, 108 S. Ct. at 606. Futility is a very limited exception to exhaustion and is not present in this case.

6. Following *Honig,* courts have rarely found the requirement of futility to be satisfied such as would excuse exhaustion of administrative remedies. Indeed, one federal court has found that even when a student appears to be deprived of due process in the administrative proceedings, the requirement of exhaustion is not excused. *Demers v. Leominster School Dep't,* 96 F. Supp. 2d 55, 58 (D. Mass. 2000). As noted in Defendant's Motion to Dismiss, exhaustion is not excused nor is futility established by virtue of one party's disagreement with the provisions of an order or the relief obtained. *See Charlie F. v. Board of Education of Skokie County School District 68,* 98 F.3d

ClibPDF - www.fastio.com

989, 993 (7th Cir. 1996).

7. Moreover, even if the Court finds it has jurisdiction in this case, it should decline to exercise jurisdiction in this case based on the principles of abstention and comity. *See Younger v. Harris,* 401 U.S. 37, 44, 91 S. Ct. 746, 751-52 (1971). Accordingly, Defendant HCISD respectfully requests the Court to grant its previously filed Motion to Dismiss.

## II.

## EVEN IF THE COURT HAD JURISDICTION, THE COURT SHOULD NOT MODIFY DEFENDANT'S SOUND TESTING PRACTICES UNDER IDEA

8. It must first be noted that Plaintiff has no legal right to attend or record an educational evaluation required of the District by IDEA. There is no constitutional right for a student to be accompanied by his parent and/or attorney during a school evaluation. Texas does not recognize a right to counsel during a psychiatric examination. *Lagrone v. State,* 942 S.W.2d 602, 612 (Tex. Crim. App. 1997) (a juvenile does not have a Sixth Amendment right to counsel during a psychiatric examination); *Cantu v. State,* 994 S.W.2d 721, 736 (Tex. App. — Austin 1999, no pet.) ("...[b]ecause of the intimate, personal and highly subjective nature of a psychiatric examination, the presence of a third party in a legal or non-medical capacity would severely limit the efficacy of the examination").

9. Moreover, there is no right under school law for a parent to attend or record an evaluation. A parent has certain articulated rights as to school district functions. Chapter 26 of the Texas Education Code, **Parental Rights and Responsibilities**, sets out *specific parental rights*, which include the right to access student records § 26.004, the right to access state assessments and teaching materials, § 26.005, 006; the right to various kinds of information, § 26.008 *et seq*., and the

ClibPDF - www.fastio.com

right to provide consent before a district may conduct a psychological examination, "... *unless the examination ... is required under Section 38.004 or state or federal law regarding requirements for special education;*" § 26.009(a)(1). However, nowhere in the Texas Education Code is a parent provided the *right to attend* a school district evaluation or any other type of testing, of a special or general nature, nor the *right to record* educational testing.

10. Further, there is no right of a parent to attend or record a School District's evaluation under IDEA. The Individuals with Disabilities Education Act, (IDEA), which governs a school district's obligations in connection with evaluations at issue in this case, has little to say with respect to how evaluations are to be conducted, *except to require that any standardized tests that are given to a child – . . "(ii) Are administered by trained and knowledgeable personnel* ***in accordance with any instructions provided by the producer of the tests.***" 34 C.F.R. § 300.532 (c)(1). This is significant, however, as test publishers routinely admonish that only an examiner and examinee be present in a testing situation. A parent who disagrees with an evaluation conducted by a school district has a specific remedy, to request an independent evaluation (IEE) at public expense if he disagrees with an evaluation obtained by the District. 34 C.F.R. § 300.502 (b). In the case *sub judice*, Plaintiff does not have the right to observe or record the evaluation.

11. Next, HCISD District practices in test administration do not allow third party presence or recording. This is because the presence of a third party observer and/or the videotaping of an evaluation is inconsistent with the standards of practice and with manual instructions governing test administration in commonly used instruments. *See* Defendant's Exhibit A.

12. Additionally, it is crucial to note that Plaintiff asks this Court to modify the provisions under which the evaluation may be conducted in such a way that test validity may be

ClibPDF - www.fastio.com

compromised. While Plaintiff is no longer challenging the District's right to conduct an evaluation through Dr. Oakland, he seeks to impose testing conditions which are nonstandard and which will adversely affect test validity. It is well known to testing professionals that nonstandard testing conditions will jeopardize reliability and usefulness of the results. *See* Defendant's Exhibits B, C, and D. Even if the observer is unseen, the test results may be jeopardized. Because "observer effects can be magnified by the presence of *involved parties who have a significant relation* with the patient (*e.g.* legal representatives who have a stake in the outcome of the examination ... )," their presence "... may represent a threat to the validity and reliability of the data generated by an examination conducted under these circumstances, and may compromise the valid use of normative data in interpreting test scores. ***Observer effects also extend to situations such as court reporters, attorneys, attorney representatives, viewing from behind one-way mirrors and to electronic means of observation, such as the presence of a camera which can be a significant distraction.***" Defendant's Exhibit C, p. 2, Presence of Third Party Observers During Neuropsychological Testing Official Statement of the National Academy of Neuropsychology (Archives of Clinical Neuropsychology, Vol. 15; Issue 5, pp 379-80, July 2000) [italics and emphasis added].

13. Moreover, it cannot be supposed that C.K. is unaware of the litigation between his father and the school district. The child attended and observed the November 1, 2000 preliminary injunction hearing. Therefore, a parental observation will be anticipated or known to this child during testing, even if the parent is 'unseen.' Such a scenario is, according to testing professionals who have considered such issues, calculated to produce an observer effect on test validity, in part by virtue of the greater emphasis placed on the testing event in this child's mind. *See* Defendant's Exhibit B, p. 3; Defendant's Exhibit D, p. 2.

ClibPDF - www.fastio.com

14. A court should not craft judicial exceptions to a district's right to control the terms of its own IDEA evaluation, where none exists in statute, regulation or case law. As noted by the Supreme Court in *Board of Educ. v. Rowley*, 102 S. Ct. 3034, 3051, ". . [C]ourts must be careful to avoid imposing their view of preferable educational methods upon the states."

## III.

## CONCLUSION

This is simply not a case in which the Court has jurisdiction to review or modify the terms of the Special Education Hearing Officer's interlocutory order regarding the evaluation of the minor C.K. Jurisdiction to review interlocutory order is granted only in specific instances, such as in a case in which the federal district court grants an injunction. *See* 28 U.S.C. § 1292(a)(1). Further, plaintiff has not shown that it is futile to exhaust his administrative remedies. He simply wants a second bite at the apple to try to obtain a more favorable order than was entered by either of the two special education hearing officers that have been assigned to this case, one of whom plaintiff has now sued. Moreover, even if this Court thought the very narrow and limited exception of futility had been satisfied, the Court should nonetheless decline to exercise jurisdiction based on principles of abstention and comity in deference to the state proceeding and the hearing officer's decision below. Finally, if the Court found it had jurisdiction and declined to abstain from the matter, on the merits the Court should refuse to modify the terms of the evaluation order entered by the Special Education Hearing Officer because the modifications plaintiff seeks could compromise the validity of the test data.

For these reasons and the reasons shown in previous briefing by Defendant, Defendant respectfully requests this Court grant its Motion to Dismiss, deny plaintiff's application for a

ClibPDF - www.fastio.com

preliminary injunction, and award Defendant HCISD its attorneys' fees and costs pursuant to 28 U.S.C. § 1927 and TEX. EDUC. CODE ANN. § 11.161 (Vernon 1996). Defendant also requests such other and further relief, both general and specific, at law or in equity, to which it may be entitled.

Respectfully submitted,

WALSH, ANDERSON, BROWN,
SCHULZE & ALDRIDGE, P.C.
P.O. Box 2156
Austin, Texas 78768
TELEPHONE: (512) 454-6864
FACSIMILE: (512) 467-9318

BY: ______________________
BRIDGET ROBINSON
State Bar No. 17086800
S. Dist. Admission No. 16521

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November, 2000, a true and correct copy of the above and foregoing pleading was served upon counsel of record by placing same in overnight mail postage prepaid and addressed as follows:

William Kimball
Koppel, Ezell, Jackson & Kimball, L.L.P.
312 E. Van Buren
Harlingen, TX 78550

______________________
BRIDGET ROBINSON

ClibPDF - www.fastio.com

DOCKET NO. 388-SE-600

| | | |
|---|---|---|
| CHRISTOPHER K., B/N/F WILLIAM K., Petitioner, | § | BEFORE A SPECIAL EDUCATION |
| | § | |
| v. | § | HEARING OFFICER |
| | § | |
| HARLINGEN Consolidated INDEPENDENT SCHOOL DISTRICT, Respondent. | § | FOR THE STATE OF TEXAS |

*Affidavit of Jolaine Lanehart*

State of Texas §
§
County of Cameron §

BEFORE ME, the undersigned authority, personally appeared Jolaine Lanehart, who, being by me duly sworn, deposed as follows:

"My name is Jolaine Lanehart, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Director of Special Education for the Harlingen Consolidated Independent School District, ("District" or "HCISD" herein), and I have held that position since July 1, 1995. I have worked in education for 24 years, including 8 years as a teacher, 2 as an educational diagnostician, and 14 as an administrator. I hold a B.A. degree in English and a M.Ed. degree in Special Education, and I hold the following professional certifications: Diagnostician, Mid-management, Supervision, Mentally Retarded, Deficient Vision, Language & Learning Disabilities, High School German and High School English.

In my capacity Special Education Director for HCISD I am directly responsible for the work of the educational diagnosticians who conduct psychometric testing in the District. I am familiar with instruction manuals for numerous published test instruments, and they routinely suggest that the test situation be planned to include only the examiner and the examinee in order to avoid distractions or interference which may reduce the validity of test results.

For this reason, it is the standard practice in HCISD to limit the testing situation only to the examiner and the examinee. Third parties are not allowed to observe, intrude or establish a presence in the testing situation, including by a videotaped recording. This has always been the standard practice in HCISD, with rare exceptions not applicable to this age group and type of testing, for as

EXHIBIT
A

DEFENDANT'S
EXHIBIT
A

long as I am aware. Likewise it is the standard practice in every other school district in which I have worked over 24 years.

The purpose of this practice is to maintain the validity and reliability of the test results by adhering to the test conditions under which the test publisher has standardized the instrument. Were a test to be conducted under nonstandard conditions, it invalidates the test results and limits the uses of the data. A nonstandard set of scores may not be used to establish any eligibility for special education that is dependent on the use of standard scores, such as those which call for the measurement of IQ and achievement levels.

Jolaine Lanehart
AFFIANT, JOLAINE LANEHART

SUBSCRIBED AND SWORN tor before me on this 23rd day of October 2000.

DONNA WHITE
Notary Public
STATE OF TEXAS
My Comm. Exp. 08-14-2003

Donna White
Notary Public, in and for the State of Texas

My commission expires: 8-14-2003



DOCKET NO. 388-SE-600

| | | |
|---|---|---|
| CHRISTOPHER K., B/N/F WILLIAM K., Petitioner, | § | BEFORE A SPECIAL EDUCATION |
| v. | § | HEARING OFFICER |
| HARLINGEN Consolidated INDEPENDENT SCHOOL DISTRICT, Respondent. | § | FOR THE STATE OF TEXAS |

***Affidavit of Thomas Oakland, Ph.D.***

State of Florida §
§
County of Alachua §

BEFORE ME, the undersigned authority, personally appeared Thomas Oakland, Ph.D., who, being duly sworn, deposed as follows:

"My name is Thomas Oakland, Ph.D., I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am a licensed psychologist since 1970. I am a Diplomate in School Psychology, Professional Neuropsychology and Forensic Examiner. I am a Fellow of the American Psychological Association in the Divisions of Evaluation, Measurement and Statistics, Educational Psychology, School Psychology, and International Psychology. I have practiced in the field of school psychology for over 30 years, which experience has included the psychological and educational testing of children. I have instructed graduate students in the area of psychological assessment and evaluation at the University of Texas at Austin from 1967 to 1995, and at the University of Florida since 1995. I have extensive personal experience in testing students for over 30 years.

I currently consult on test development with the publishers of widely used psycho educational testing instruments, such as Wechsler Intelligence Scale for Children - III, the Wechsler Individual Achievement Test, the Wechsler Preschool and Primary Scale of Intelligence - III, the Wechsler Adult Intelligence Scale - III. I have authored three nationally standardized tests used with children and also co-authored the Standards for Educational and Psychological Testing. This publication forms industry standards for test development and use. I authored the only standardized

DEFENDANT'S EXHIBIT B

Blumberg No. 5114

measure of testing-taking behavior and am seen as the leading expert on the influence of test-taking behavior on test performance.

A test consists of a sample of behavior directly observed under standardized conditions. The test manual prescribes the manner in which a test is to be administered and scored. Deviations or changes to the manner in which a test is administered are to be avoided so as to maintain standardized conditions. Two documents from the American Psychological Association (APA), referenced below, set standards concerning testing. Both direct the testing professional to insure that test conditions do not unduly interfere with test performance, noting that test conditions will normally be similar to those used to standardize the test.

***Issue of Test Validity***. *Standards for Educational and Psychological Testing* require the test administrator to follow carefully the standardized procedures for administration and scoring specified by the test developer (Standard 5.1). Manuals for individually administered tests require that the examiner and the subject be the only two persons present during testing and that the examiner should adhere carefully to the administration procedures used to standardize the instrument. Test conditions which are used to standardize a test are highly controlled, with only the examiner and subject present.

Furthermore, the testing environment should furnish reasonable comforts with minimal distractions (Standard 5.4). Test users have the responsibility of protecting the security of test materials at all times (Standard 5.7).

***Issue of Test Security***. *APA Ethical Principles of Psychologists and Code of Conduct* require psychologists to maintain test security (Standard 2.10). Test purchase and use are restricted to those competent to use them. Parents and others who lack proper credentials who may desire to obtain copies of tests cannot do so, because the validity of standardized tests is compromised when the general public knows the questions being asked. Clearly, the recording of a test session by a parent or others, creates an unauthorized copy of the test questions.

***IDEA Requirements***. The *Individuals with Disabilities Education Act (IDEA)* requires the use of standardized tests administered by trained professional personnel under standardized conditions. *IDEA* also requires the use of individually administered tests instead of group administered tests, given that individually administered tests allow examiners to control and minimize extraneous conditions that may interfere with a valid assessment, including the removal of conditions that may distract the child being tested. The presence of distractions, interference, and other extraneous conditions may reduce the accuracy of the test results.

***Deviations from Standard Practices***. As noted above, permitting deviations from the conditions under which a test was standardized jeopardizes the validity of the results because it permits non-standardized variables to be introduced to the testing situation. Since tests are standardized in a private one-to-one setting, the introduction of a third presence in testing constitutes a condition that deviates from those under which the test was standardized. A third presence would

ClibPDF - www.fastio.com

include the actual presence in the testing room of a person or a camera. A third presence would also exist if the test subject had knowledge that someone was observing or recording out of sight.

***Observation for Training Purposes***. At the university graduate level, in training school psychologists and educational diagnosticians, the discreet recording or observation of testing is permitted for the purpose of training the examiner. However, the results are compromised by these parameters and cannot be relied on as accurate clinical data for the subject's educational diagnosis and intervention. To routinely record testing in which the purpose is clinical would be grounds for a complaint to the licensing board of the tester.

***Summary***. Thus, practices that violate standardized administration compromise industry standards and those of the American Psychological Association, because they jeopardize the validity of test results. For this reason, nonstandard practices are inconsistent with the requirements of the *IDEA*, which requires the use of standardized tests administered in accordance with professional standards.

In the instant case, it appears the child subject will have knowledge of a parental observation or recording, or the likelihood of such parental presence. I also understand the child has observed a court proceeding and is aware of litigation between the parent and school. These conditions are very likely to affect the child's test performance. In the literature this is known as the *Pygmalion Effect*, that is, the act of observing changes the behavior observed. In fact, if a child subject merely thinks another person, especially a parent, is observing the test, even if the observer is not seen, the validity of the test may be affected. Even uncertainty in the mind of the subject about whether an unseen person is observing can affect subject responses. It is best to be able to assure the subject that no one else is observing the test, so he has no uncertainty about whether unseen persons are observing.

Thomas Oakland

**AFFIANT, THOMAS OAKLAND, PH.D.**

**SUBSCRIBED AND SWORN** to before me on this 2nd day of November 2000.

LINDA B. CROSBY
MY COMMISSION # CC 845428
EXPIRES: July 4, 2003
Bonded Thru Notary Public Underwriters

Linda B. Crosby

Notary Public, in and for the State of Florida

My commission expires: 07/04/2003

ClibPDF - www.fastio.com



journals

# Archives of Clinical Neuropsychology

Volume 15, Issue 5
July 2000
Pages 379-380

SummaryPlus
▸ Article
Journal Format-PDF (63 K)

PII: S0887-6177(00)00053-6
Copyright © 2000 National Academy of Neuropsychology. Published by Elsevier Science Ltd.

**Editorial**

# Presence of Third Party Observers During Neuropsychological Testing

## Official Statement of the National Academy of Neuropsychology

Available online 7 July 2000.

## Article Outline

- Approved 5/15/99
- References

## Approved 5/15/99

Forensic neuropsychological evaluations are often constrained by the demand that a third party observer be present during the course of interview and formal testing. This demand may originate from counsel's desire to ensure that the neuropsychologist does not interrogate or unfairly question the plaintiff with respect to issues of liability and to ascertain if test procedures are accurately administered. In general, neuropsychologists should have the right to carry out their examination in a manner that will not in any way jeopardize, influence or unduly pressure their normal practice.

The presence of a third party observer during the administration of formal test procedures is inconsistent with recommendations promulgated in The Standards for Educational and Psychological Testing (APA,

DEFENDANT'S EXHIBIT C

1985) and Anastasi (1988), at the psychological testing environment be distraction free. More recently, standardized test manuals ( r example, The WAIS-III, WMS-III Technical Manual; The Psychological Corporation, 1997) have sp cifically stated that third party observers should be excluded from the examination room to keep : free from distraction. The presence of a third party observer in the testing room is also inconsistent w ih the requirements for standardized test administration as set forth in the APA's Ethical Principles O Psychologists and Code Of Conduct (APA, 1992) in that it creates the potential for distraction an or interruption of the examination (McSweeny et al., 1998).

A second issue that relates the potential influence of the presence of a third party observer is the reliance upon normative da a. Neuropsychological test measures have not been standardized in the presence of an observer. In fact, neuropsychological test measures have been standardized under a specific set of highly contr lled circumstances that did not include the presence of a third party observer. The presence of a third par observer introduces an unknown variable into the testing environment which may prevent the exa inee's performance from being compared to established norms and potentially precludes valid interpretation of the test results (McCaffrey, Fisher, Gold, & Lynch, 1996). Observer effects can be su that performance on more complex tasks declines, in contrast to enhanced performance on overlearne tasks, leading to a spuriously magnified picture of neuropsychological deficit (McCaffrey et al., 1 96). Likewise, observation of an examination being conducted for a second opinion may fundamentall alter the test session, in comparison to the initial examination that the has already undergone, po ntially creating an adversarial atmosphere, and increasing the risk of motivational effects relate o secondary gain. Observer effects can be magnified by the presence of involved parties who have significant relationship with the patient (e.g. legal representatives who have a stake in the outcome of t examination; cf. Binder and Johnson-Greene, 1995). Thus, the presence of a third party observer duri formal testing may represent a threat to the validity and reliability of the data generated by an exam ation conducted under these circumstances, and may compromise the valid use of normative data in in rpreting test scores. Observer effects also extend to situations such as court reporters, attorneys, attorn representatives, viewing from behind one-way mirrors and to electronic means of observation, such s the presence of a camera which can be a significant distraction (McCaffrey et al., 1996). E ectronic recording and other observation also raises test security considerations that are det iled in the National Academy of Neuropsychology's position statement on Test Security.

It should be noted that the are circumstances that support the presence of a neutral, non-involved party in nonforensic settings. O situation might be when students or other professionals in psychology observe testing as part of t eir formal education. These trainees have sufficient instruction and supervision in standardize measurement and clinical procedures, such that their presence would not interfere with the assessm t process. Other situations might include a parent's calming presence during an evaluation of a child.

The weight of accumulate scientific and clinical literature with respect to the issue of third party observers in the forensic e mination provides clear support for the official position of the National Academy of Neuropsycho gy that neuropsychologists should strive to minimize all influences that may compromise accuracy of a essment and should make every effort to exclude observers from the evaluation.

The NAN Policy and Plan ing Committee

Bradley Axelrod, Ph.D.

Jeffrey Barth, Ph.D., Chai

2

David Faust, Ph.D.

Jerid Fisher, Ph.D.

Robert Heilbronner, Ph.D.

Glenn Larrabee, Ph.D.

Neil Pliskin, Ph.D., Vice C[ha]ir

Cheryl Silver, Ph.D.

## References

American Psychological A[ss]ociation, 1985. *Standards for Educational and Psychological Testing*, Author, Washington, DC.

American Psychological A[ss]ociation, 1992. Ethical Principles of Psychologists and Code of Conduct. *The American Psycholog[is]t* 47, pp. 1597–1611.

Anastasi, A., 1988. *Psych[olo]gical Testing* (6th ed ed.),, Macmillan Publishing Company, New York.

Binder, L.M. and Johnson-[G]reene, D., 1995. Observer effects on neuropsychological performance: A case report. *The Clinical N[eu]ropsychologist* 9, pp. 74–78. EMBASE

McCaffrey, R.J., Fisher, J. [M]., Gold, B.A. and Lynch, J.K., 1996. Presence of third parties during neuropsychological evalu[ati]ons: Who is evaluating whom?. *The Clinical Neuropsychologist* 10, pp. 435–449. EMBASE

McSweeny, A.J., Becker, [B.]C., Naugle, R.I., Snow, W.G., Binder, L.M. and Thompson, L.L., 1998. Ethical issues related to th[ir]d party observers in clinical neuropsychological evaluations. *The Clinical Neuropsychologist* 12 4, p[p.] 552–559. EMBASE

The Psychological Corpo[rat]ion, 1997. *The WAIS-III, WMS-III Technical Manual*, Author, San Antonio.

Archives of Clinical Neur[op]sychology
Volume 15, Issue 5
July 2000
Pages 379-380

Send feedback to ScienceDirec[t]
*Software and compilation © 2[00]0 ScienceDirect. All rights reserved*

DEFENDANT'S EXHIBIT D

# Psychiatry/Psychology

## Psychiatric/Psychological Evaluations Should Not be Observed or Recorded by Opposing Counsel

*by Daniel P. Greenfield, M.D., M.P.H., M.S., DABFE, DABFM*

© Peter Angelo Simon/Phototake

**...the basic parameters and milieu of an IME are essentially the same as for a clinical interview or session: Privacy, quiet, non-interference from others, and an environment in which information and ideas can be freely exchanged...**

We have all had the experience. While waiting for an individual to arrive for a psychiatric/psychological independent medical examination ("IME") appointment, that individual is either accompanied by or preceded by his/her attorney, stating that s/he "will be sitting in on the examination... Don't worry, Doctor, I'll be quiet and not interfere. I'll just observe." This was unexpected. After overcoming the initial surprise, resentment, and sheepishness at not having anticipated this snafu, one is left with several courses of action:

1. Accept the attorney's presence, and proceed with the interview/examination;
2. Refuse to proceed with the interview/examination, and cancel the procedure;
3. Advise the attorney and his/her client that you must speak with your retaining counsel to discuss how and/or if to proceed;
4. Advise the attorney that although you oppose this practice (if that is true), you insist on his/her speaking with your retaining counsel to discuss whether or not, and/or how, to proceed (thereby leaving the actual decision about proceeding to the attorneys).

In my view, none of these courses of action is desirable, given the basic premise that the observing of forensic psychiatric interviews/examinations by third parties is generally not advisable and is generally clinically contraindicated (Table 1).

In this scenario, the basic element is that of surprise—of ambush. For the usual forensic psychiatric/psychological examiners, the basic parameters and milieu of an IME are essentially the same as for a clinical interview or session: Privacy, quiet, non-interference from others, and an environment in which information and ideas can be freely exchanged (1), to the extent that the nature and purpose of the forensic interview/examination will permit. The observation/ recording scenario violates all of these parameters, especially by virtue of its unexpectedness. Even if advance notice is received of opposing counsel's intention to "...sit in on the examination," the privacy of the IME is still challenged, and in my experience, an unnecessary amount of time and effort must be expended to clarify whether or not the IME is to be observed and/or recorded.

In this paper, the basic premise is that a psychiatric/psychological interview/examination is fundamentally a clinical exercise, and as such should be as private as possible: Such privacy precludes on-site

observation and/or video or audio recording of the examination.

In this article, I discuss clinical reasons for refusing to permit such observation; review legal case authority, some of which supports this position and some of which does not; and present guidelines and recommendations for the forensic psychiatric/psychological practitioner for anticipating and preventing this potential problem.

## Clinical Considerations

The following Table is based on a letter/report created on the forge of necessity the night before it had to be included as a supporting document in a legal brief.

**Table 1: Contraindications to Observing and Recording Psychiatric/Psychological Forensic Evaluations**

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

This brief, in turn, supported the author's position that opposing counsel should not be permitted to attend the interview/examination of the counsel's client. In response to the brief and argument in this case, and in a humorous and quotable comment, the Federal Magistrate Judge hearing the argument offered the following opinion: "With all due respect to the good faith desire of most attorneys to comply with court orders, most attorneys have an absolute inability to behave like potted plants; and indeed, vociferously protest that their role cannot be limited to such a degree... the Court finds, based on its own common sense and also upon its review of Dr. Greenfield's letter of July 8th, 1997, that such as procedure [observation and/or recording of a psychiatric/psychological examination] would indeed make it difficult to conduct an appropriate and proper clinical examination... The Court will direct that the examination proceed with neither tape recording nor counsel present..."(2)

Implicit in the Magistrate Judge's decision, in my view, are the concepts that a forensic psychiatric IME is a clinical examination, conducted for the purpose of helping the finder of fact learn the truth. It is intended to be as objective and unbiased as possible; and is geared toward the examiner's advocacy for his/her opinion, not toward either party. Table 2 expands on these concepts.

While I recognize and accept that a number of factors may influence and bias the attitudes, motivation, and biases of both the examiner and the examinee in these situations (including whether the case itself is civil or criminal; whether the examiner is retained by the defense, prosecution, the

**Table 2: Differences Between Clinical and Forensic Psychiatric/Psychological Examinations**

| PARAMETER | CLINICAL EXAMINATION | FORENSIC EXAMINATION |
|---|---|---|
| Purpose | Evaluation; treatment | Evaluation; opinion |
| Advocacy | To interviewee (biased) | To opinion (neutral) |
| Confidentiality/ Privacy | To interviewee; may be limitations | None, or limited |
| Scope | May be extended; multiple sessions | Limited; one or few sessions |
| Interviewee's Perception of Examiner | Advocate | Advocate (examiner for plaintiff); or Adversary (examiner for defense) |

court, or is jointly appointed; and whether the examinee can understand and accept the notion of the examiner's neutrality), I have also found that the presence of third parties and/or recording devices in these clinical examination situations exaggerates and exacerbates the resistances that examinees have--particularly their perception of the adversarial nature of the IME--and unnecessarily inhibits and detracts from the IME process itself.

So far, I have discussed this topic from the perspective of the mental health clinician who does the IME: My contention is that this is a simple and straightforward issue, no different from the privacy required for a clinical consultation or treatment examination.

When legal issues, precedents, and constraints enter into this arena, however, the issue becomes muddy. That area will be discussed next.

## Legal Considerations

"The Superior Court, Appellate Division... held that plaintiff was entitled to employ unobtrusive audio recording device during psychological examination of plaintiff, despite examining psychologist's preference to the contrary; overruling Stoughton v. B.P.O.E...."(3)

"...In these four cases, there have either been no reasons presented or those presented are not adequate to establish good cause. The motions to compel unaccompanied and/or unrecorded IME's in all four cases are granted..."(4)

"...The Superior Court, Law Division... held that examination could be conducted without presence of plaintiff's attorney, tape recorder, or any third party being present..."(5)

"The Federal courts have consistently held that plaintiff's attorney may not be present during these exams..."(6)

When legal issues and constraints enter into the essentially clinical question of observation or recording of IME's, the situation becomes muddied and confused, underscoring again the fundamental adversarial nature of legal dispute resolution and the neutral nature of the role of the expert witness/clinician in this arena. Although the clinician tends to regard the issue of whether or not the interview/examination is recorded/observed or not as a simple, straightforward, and binary proposition (i.e. either it is or is not), when forensic interview/examinations are considered and legal

2

ClibPDF - www.fastio.com

reasoning enters the fray, a myriad of additional factors comes into play. Legal precedents and rulings may determine whether record/observation of an interview/examination will take place within a given jurisdiction.

For example, in the Federal jurisdiction, courts within the Third Circuit have generally prohibited attorneys from attending psychiatric examinations of their clients. (7-12) Similarly, New York Federal Courts have generally refused to permit plaintiff's counsel to attend psychiatric examinations of their clients. (13-16) However, there are always exceptions: In Vreeland v Ethan Allen, Inc., for example, the court held that "...it was not an abuse of discretion for a magistrate judge to have permitted plaintiff's counsel to be present for an examination notwithstanding the weight of authority within the Second Circuit holding that counsel should not be present during a psychiatric examination of the plaintiff..." (17)

To further complicate what is essentially a simple and straightforward clinical issue, legal precedents and reasoning, sometimes even in the same jurisdiction (although at different levels of authority), may be inconsistent with and in conflict with one another. For example, in New Jersey, a recent Superior Court, Appellate Division case (at a level of higher authority than Superior Court, trial level) (3) determined the following:

"...plaintiff was entitled to employ unintrusive audio recording device during psychological examination of plaintiff, despite examining psychologist's preference to the contrary, overruling Stoughton v. BPOE." (3)

Virtually simultaneously, in a Superior Court trial level case in the same State, the opposite decision was reached about the same straightforward clinical issue: "...in these four cases, their have either been no reasons presented or those presented are not adequate to establish good cause. The motions to compel unaccompanied and/or unrecorded IME's in all four cases are granted..." (4) The savvy plaintiff's attorney in New Jersey who wishes to record/observe his client's interview/examination would simply cite the BP v Carley (3) case and ignore the less powerful and authoritative Briglia v Exxon Co. USA (4) case. The above examples cover only a small sample of possible jurisdictions and nuances or the law applicable to the issue under discussion. Different states and Federal geographic areas have different case law applicable to this issue: a straightforward clinical question is muddied and obfuscated.

Given the condition of the law regarding this issue of attorneys' observing/recording (or not) forensic psychiatric/psychological interviews/examinations, what is the examining clinician to do when faced with that prospect? That question will be discussed next.

## Recommendations

Any psychiatrist/psychologist engaged in forensic work involving interviewing/examining people is at risk for potentially being faced with the ambush scenario presented at the beginning of this paper. And as with anything and everything in forensic work, "preparation is everything." Therefore, I recommend that the at-risk forensic clinician be prepared in the following ways for the prospect of having his/her interview/examination recorded and/or observed (these recommendations are also summarized in Table 3): Know your own preference. While I do not feel that forensic psychiatric/psychological interviews/ examinations should be recorded and/or observed (Table 1), other forensic clinician evaluators may disagree, for whatever reasons. If that is the case, then this issue is moot, and further preparations and actions to address this prospect will not be necessary. Communicate your preference to counsel. Early on after being retained to do an evaluation, advise retaining counsel about this issue and about your preference (if that is the case) that the interview/examination not be recorded and/or observed.

**Table 3: Recommendations**

- Know your preference
- Communicate your preference to counsel
- Know, document, and communicate the specifics about your preference
- Be firm in your preference
- Know some law
- Have a strategy in case of "ambush"
- Be prepared to compromise
- "Preparation" and "acceptance" are key concepts
- In the final analysis, conduct the interview/examination in your usual way

Know, document, and communicate specifics about your preference. Be prepared to help retaining counsel have your preference carried out by discussing and clarifying your preference with counsel, in writing if possible. In that regard, I have found it useful to provide a documentation package to that effect to counsel, for counsel to review and use with opposing counsel, if advisable.

Be firm in your position if it is against the recording/observing of your interview/examination. Be prepared to provide documentation, or additional documentation, from a clinical perspective, to retaining counsel supporting your preference. Be aware that you may be required to testify (at a Motion Hearing, for example) in support of your position.

Know some law on the subject, and convey that law to retaining counsel. Insist that counsel research the law in the jurisdiction applicable to your upcoming interview/examination, and be prepared to deal with repercussions of that law, whatever they may be.

If you are "ambushed," be prepared to postpone the interview/examination until the observation/recording issue is resolved (this is option 2., described at the beginning of this paper) whatever that resolution may be.

Be prepared to compromise on your preference if applicable law goes against that preference. But, protect your preference as much as possible (e.g. make sure that the recording device is truly "unobtrusive," if that is what applicable law requires).

Conduct the interview/examination, whether observed/recorded or not, as you customarily conduct any clinical interview/examination. The condition of its being observed/recorded, in the final analysis, should not make

ClibPDF - www.fastio.com

any significant difference to the nature and handling of the interview/examination itself.

## In Conclusion

Although psychiatrists and psychologists and their evaluations are integral to the legal process in the context of forensic work, their clinical approach to these evaluations is necessarily different from the adversarial mind set of attorneys who retain them for that purpose, and of those attorneys' opposing counsel. One of the consequences of that difference, in my experience, is attorneys' distrust of the required objectivity and neutrality of the forensic psychiatrist's/psychologist's clinical interview/examination of their client. And one of the consequences of that distrust is the periodic insistence that these interviews/examinations be observed and/or recorded by opposing counsel.

In this paper I have taken the position that forensic psychiatric interviews/examinations should not be observed and/or recorded. I have reviewed clinical and legal aspects of this issue, and have concluded with a series of recommendations for the forensic psychiatrist/psychologist to follow when confronted with this issue.

The keys to successfully dealing with this issue, again, are preparation and acceptance. "Preparation" refers to being aware of the nuances, and clinical and legal aspects of this potentially bedeviling issue. "Acceptance" refers to recognizing that the law may put constraints onto and require compromises from evaluating forensic psychiatrists and psychologists regarding this issue. By being both ready and accepting of the nuances and compromises concerning that issue, the forensic psychiatrist/psychologist will be better able to address it and to maintain the professional integrity of the clinical interview/examination of an individual in a forensic context.

## References

1. MacKinnon, R.A. and R. Michaels, The Psychiatric Interview in Clinical Practice (1971), Philadelphia: W.P. Saunders Co.
2. Brennan v Norton, "Transcript of Motion before the Honorable Stanley R. Chessler, U.S.M.J., July 9, 1997, Pages 8-9.
3. B.P. v Carley, 307 N.J. Super., 259 (1998).
4. Briglia v Exxon Co. USA, et.al., Law Division, in N.J. Law J., 151, 117 (March 18, 1998).
5. CAROL STOUGHTON, PLAINTIFF v. BPOE, #2151 (BRICK TWSP ELKS), VINCENT DRISCOLL AND AGNES RUMBOLO, DEFENDANTS 281N.J. Super. 605 (1995)
6. "Deviation from Standard IME Procedure May Be Allowed in Special Circumstances," N.J. Law J., 151, 117 (March 18, 1998), Page 57.
7. Walter DZIWANOSKI v. OCEAN CARRIERS CORPORATION, a body corporate, Defendant and Ore Steamship Corporation, a body corporate, and Calmar Steamship Corporation, a body corporate, Defendant and Third-Party Plaintiff v NACIREMA OPERATING COMPANY, INC., Third Party Defendant, 26 F.R.D.595; 4 Fed.R.Serv.2d (Callaghan) 640; December 28, 1960
8. Hollett v. Dundee, Inc., 272 F. Supp. 1 (D.Del. 1965)
9. William L. WARRICK and Joan G. Warrick, his wife, Plaintiff's v. Harold K. BRODE and Joseph T. Richardson, Inc., Defendants, 46 F.R.D. 427; 13 Fed.R.Serv.2d (Callaghan) 992; March 24, 1969
10. Louis NEUMERSKI v. Joseph A. CALIFANO, Jr., Secretary of the United States Department of Health, Education, and Welfare. 513 F.Supp 1011 (1981)
11. Helen R. LOWE v. PHILADELPHIA NEWSPAPERS, INC., 101 F.R.D. 296; 37 Fed.R.Serv.2d (Callaghan) 1154; 44 Fair Empl.Prac.Cas. (BNA) 1224; October 21, 1983
12. NAGESH SHIRSAT v. MUTUAL PHARMACEUTICAL COMPANY, INC., 169 F.R.D. 68; 1996 U.S. Dist. LEXIS 15273; October 18, 1996
13. Dorothy BRANDENBURG, Plaintiff v. EL AL ISRAEL AIRLINES and British Airways, Defendants, 79 F.R.D., 543; 25 Fed. R. Serv. 2d (Callaghan) 186; March 29, 1978
14. Curtis M. SWIFT, Plaintiff, Kimberly Swift, a minor by her guardian ad litem, Frances E. Dorn, Intervening Plaintiff v.Hamptom M SWIFT and Mercantile Trust Company, National Association, Defendants, 64 F.R.D. 440, 18 Fed R.Serv.2d (Callaghan) 581, March 11, 1974
15. Domenico DIBARI, Plaintiff v Incaica Cia ARMADORA, S A, Defendant, 126 F R D., 12 13 1989 U S Distr LEXIS 16612; 14 Fed R Serv 3d (Callaghan) 1362; June 7 1989
16. Amine Baba-A: Plaintiff,-against-The City of New York, et al, Defendants, 92 Civ 7957 (DAB)(THK),1995 U S, Dist LEXIS 18883, December 19, 1995
17. PATRICIA VREELAND, CHARLES R GODFREY, PETER F. PERRI, KAREN M KELLY, ROBERT A. DETLEFS, DOLORES BENISH, ELEANOR PADOVANI, JAMES F CLARKE, Individually and on behalf of all other persons similarly situated, Plaintiffs v ETHAN ALLEN, Inc, Defendant, 151 F.R.D. 551, U.S. Dist LEXIS 17017, 28 Fed R Serv 3d. (Callaghan) 519, 63 Fair Empl.Prac Cas. (BNA) 670, December 3, 1993

## About the author

Daniel P. Greenfield, M.D., M P.H., M.S., is a board certified psychiatrist, preventive medicine specialist, and addiction medicine specialist, educated and trained in these areas at the University of North Carolina, University of London, Harvard University, and the New York Hospital-Cornell Medical Center. Dr. Greenfield has had extensive clinical and forensic experience in psychiatry and addiction medicine over the past twenty-five years, and has lectured, testified, and published widely in these areas; he is also the author of Prescription Drug Abuse and Dependence (1994; Charles C. Thomas, Publisher). In addition to his practice and consulting activities, Dr. Greenfield is a clinical faculty member with the Department of Psychiatry at the Albert Einstein College of Medicine and Montefiore Medical Center in Bronx, New York.

